*Joseph Antonio, et al. v. SSA Security, INC. d/b/a Security Services of America*, Misc. No. 1, September Term, 2014

STATUTORY INTERPRETATION – MARYLAND SECURITY GUARDS ACT – VICARIOUS LIABILITY – Court of Appeals held that Maryland Code (2000, 2010 Repl. Vol.), Business Occupations & Professions Article, § 19-501 codifies Maryland's common law doctrine of respondeat superior and does not expand vicarious liability for the employers of Maryland security guards. The Maryland General Assembly did not indicate a clear intention to abrogate the common law by adoption of Maryland Code (2000, 2010 Repl. Vol.), Business Occupations & Professions Article, § 19-501 or its predecessors.

IN THE COURT OF APPEALS OF
MARYLAND

Misc. No. 1

September Term, 2014

JOSEPH ANTONIO, ET AL.

v.

SSA SECURITY, INC. d/b/a SECURITY
SERVICES OF AMERICA

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

Opinion by Harrell, J.

Filed: March 2, 2015

The federal Court of Appeals for the Fourth Circuit certified to this Court the following question of law:

> Does the Maryland Security Guards Act, Md. Code Ann., Bus. Occ. & Prof. § 19-501, impose liability beyond common law principles of respondeat superior such that an employer may be responsible for off-duty criminal acts of an employee if the employee planned any part of the off-duty criminal acts while he or she was on duty?

We answer the certified question in the negative. For reasons to be explained, we hold that § 19-501 of the Maryland Security Guards Act is a codification of Maryland's common law doctrine of respondeat superior and does not broaden the scope of vicarious liability of the employers of security guards for their employees' acts beyond these principles.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

A summary of the certified facts of this case deserve mention.[1]

Two security guard employees of SSA Security, Inc. ("SSA"), a security guard agency, and four of their confederates carried out a conspiracy to set fire during the early morning of 6 December 2004 to homes under construction in the Hunters Brook development in Charles County, Maryland. SSA had been hired previously by the builder/developer of Hunters Brook to provide security for the project while it was under

---

[1] We "accept the statement of facts in the certification order" when another court certifies a question of law to us. *NVR Mortg. Finance, Inc. v. Carlsen*, 439 Md. 427, 429 n. 2; 96 A. 3d 202, 204 n. 2 (2014). The procedural pilgrimage of the case is also included to provide context.

construction. The arson was fueled by racial animus against Appellants and a desire to prevent them from moving into the neighborhood.[2] The resulting fires destroyed ten homes and damaged twelve others (some completed and some under construction), making it one of the worst residential arsons in Maryland history. Fortunately, no one was killed or injured as a result of the crimes.

Aaron Speed, one of the arsonists, had been hired originally by SSA in November 2003, without the benefit of checking his references. Speed quit his employment with SSA in August 2004, after being reprimanded for "careless and aggressive conduct." One of Speed's supervisors placed a recommendation in Speed's personnel file that he not be considered for rehire. Despite this recommendation, Speed was rehired by SSA in November 2004.

As part of the conspiracy to set fire to the homes, Speed left his guard post at the development on 3 December 2004 in order to stash fuel that would be used by the others to set fire to the homes. While on-duty, Speed created also a map of the neighborhood, indicating which houses were owned or contracted for by racial minorities.

---

[2] Appellants were contract purchasers of the homes, but had not yet closed on the transactions or taken possession of the homes at the time of the arson. The developer bore the risk of loss due to fire. Two of the original plaintiffs in the underlying civil litigation, who had taken possession of their properties, reached a settlement of their claims with SSA. The remaining plaintiffs are Appellants here.

William Fitzpatrick, another SSA employee, was alleged also to have conspired to commit the arson.[3] Fitzpatrick was on-duty guarding the development from 6:00 PM until 5:00 AM on December 5-6, but, according to Appellants, left his post early to leave the properties unguarded so that Speed and the other conspirators could commit the arson.

Appellants asserted ultimately various civil claims in the U.S. District Court for the District of Maryland against SSA, two of its corporate affiliates, and the five convicted arsonists. One of Appellants' theories of SSA's liability contended that Maryland Code (2000, 2010 Repl. Vol.), Business Occupations & Professions Article, § 19-501 (hereinafter the Maryland Security Guards Act § 19-501) established a basis for SSA's strict liability.

Deciding a motion for summary judgment filed by SSA, Judge Alexander Williams, Jr. of the U.S. District Court held that the Maryland Security Guards Act § 19-501 was merely a codification of the common law and did not expand the doctrine of respondeat superior, contrary to the plaintiffs' contentions regarding SSA's strict liability for Speed's and Fitzpatrick's intentional torts and civil rights violations. *Antonio v. Sec. Servs. of Am., LLC*, 701 F. Supp. 2d 749, 766 (D. Md. 2010). After concluding that any intentional acts of Speed and Fitzpatrick were, considering the facts in the light most favorable to Appellants, outside the scope of employment, Judge Williams granted SSA's

---

[3] Fitzpatrick was not charged criminally with Speed and the other conspirators, all of whom pleaded guilty or were found guilty at trial. Fitzpatrick was indicted for making false statements to investigators, but was not convicted.

motion regarding its liability under the Maryland Security Guards Act § 19-501. Judge Williams would grant later SSA's renewed motion for summary judgment regarding liability arising from SSA's direct negligence and its vicarious liability for its employee's negligence.[4, 5]

On appeal, Appellants asked the federal Court of Appeals for the Fourth Circuit to reverse the District Court's decisions: (1) granting summary judgment in SSA's favor as to the negligence claims; (2) granting summary judgment in SSA's favor as to the claims premised on strict liability under the Maryland Security Guards Act § 19-501; and, (3) denying the request to certify to us the question regarding the interpretation of the Maryland Security Guards Act § 19-501. The federal appellate court, after affirming the District Court's grant of summary judgment as to the negligence claims, turned to the question requiring interpretation of the Maryland Security Guards Act.

Appellants argued, as they do now, that the Maryland Security Guards Act extends the vicarious liability of security guard agencies beyond the Maryland common law doctrine of respondeat superior. The federal appellate court considered the text of the

---

[4] The federal trial court, interpreting Maryland law regarding damages, held that damages were not available for negligently inflicted emotional harm where the plaintiff was outside the zone of danger. *Antonio v. Sec. Servs. of Am., LLC*, No. 05-CV-2982-AW, 2011 WL 3880425, at *7 (D. Md. Aug. 30, 2011). The claims of the plaintiffs who had taken possession of the properties, and thus were arguably in the zone of danger, were allowed to proceed. As noted, those claims were settled.

[5] In the course of the litigation, Judge Williams considered and denied a request to certify to us a question regarding the interpretation of the Maryland Security Company Act § 19-501.

4

statute and, after applying Maryland's cannons of statutory construction, concluded that there were conflicting indications as to the meaning of the Maryland Security Guards Act § 19-501. Thus, the Court certified the question to us to resolve the uncertainty.[6]

## II. OUR ANALYSIS

We may answer questions certified to us by a United States court or the appellate court of another state or of a tribe if the answer might be determinative of an issue before the certifying court and there is no controlling Maryland authority. Md. Code (1974, 2013 Repl. Vol.), Courts & Judicial Proceedings Art., § 12-603. The Maryland Security Guards Act § 19-501 has not been interpreted by Maryland's appellate courts before and its application could be dispositive of whether Appellants' strict liability contentions will allow certain of its claims to survive summary judgment.

The District Court dismissed several of Appellants' claims because the alleged torts and fair housing violations committed by SSA's employees were beyond the scope of their employment. Appellants argued before the federal District Court, the federal Court of Appeals, and now us that the Maryland Security Guards Act § 19-501 imposes liability on SSA for the actions of Speed and Fitzpatrick beyond those for which SSA would be liable under Maryland's common law doctrine of respondeat superior.

The relevant portion of the Act, § 19-501, provides: "A licensed security guard agency is responsible for the acts of each of its employees while the employee is

---

[6] Because the federal Court of Appeals certified the question, it did not decide whether the District Court abused its discretion in declining to certify the question.

5

conducting the business of the agency." Appellants contend that this section of the statute creates strict liability for the "on-duty" acts of employees, including those outside the scope of employment. SSA argues that the statute merely codified the Maryland common law of respondeat superior.

When interpreting statutes, our overarching goal is to ascertain and implement the intention of the Legislature. *Witte v. Azarian*, 369 Md. 518, 525, 801 A.2d 160, 165 (2002). We turn first to the words of the statute. If, in pursuit of the North Star of intent, the words of the statute, given their common and ordinary meaning, are unambiguous and express a plain meaning, our inquiry stops normally and we interpret the statute as written. *Oaks v. Conners*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995). If the text is ambiguous, however, we look to other evidence of the Legislature's intent, including the relevant statute's legislative history, the structure of the statue, the relationship of the statute to other laws, and the relative rationality of competing constructions. *Witte*, 369 Md. at 525-26, 801 A.2d at 165.

There is, however, one important and particularly relevant interpretive principle reining-in our quest to elucidate the will of the Legislature: we will not presume abrogation of the common law unless the Legislature's intent to do so is clear. *Suter v. Stuckey*, 402 Md. 211, 232, 935 A.2d 731, 743-74 (2007) (citing *Robinson v. State*, 353 Md. 683, 693, 728 A.2d 698, 702 (1999); *Lutz v. State*, 167 Md. 12, 15, 172 A. 354, 355–

6

356 (1934)). When the intent of the Legislature is unclear with regard to abrogation, we will interpret the statute to be congruent with the common law.[7]

## A. Abrogation Here of the Common Law?

Maryland's common law doctrine of respondeat superior holds employers liable "for the tortious conduct of . . . [an] employee committed while the servant was acting within the scope of the employment relationship." *Barclay v. Briscoe*, 427 Md. 270, 283, 47 A.3d 560, 567 (2012)) (quoting *Embrey v. Holly*, 293 Md. 128, 134, 442 A.2d 966, 969 (1982)). For employee conduct to be within the scope of employment, "the acts must have been in furtherance of the employer's business and authorized by the employer." *Barclay*, 427 Md. at 283, 47 A.3d at 567-68 (quoting *S. Mgmt. Corp. v. Taha*, 378 Md. 461, 481, 836 A.2d 627, 638 (2003)). Expanding the vicarious liability of security guard agencies by statute to include all on-duty acts of employees (strict liability) would alter significantly the common law scheme of respondeat superior and amount to an abrogation of the common law.

The common law doctrine of respondeat superior not only holds employers liable for the actions of their employees in furtherance of the employer's business, but also

---

[7] This rule of statutory interpretation was formulated as well to implement the will of the Legislature. *See, e.g.*, *Hooper v. City of Baltimore*, 12 Md. 464, 475 (1859) (stating that "the law . . . infers that the act did not intend to make any alteration [to the common law] other than what is specified, and besides what has been plainly pronounced"). The rule of construction seeks to limit judicial hair-splitting and reading acts of the Legislature as changing the common law when the Legislature had no such intention. In theory, it might also cause legislatures to announce clearly when it is their intent to abrogate the common law.

limits an employer's liability to those situations. It is central to the doctrine that an employee's acts committed outside the scope of employment, i.e., not in the furtherance of the employer's business, are not attributable to the employer. The universe of the types of employee acts for which the employer might be held strictly liable is limited.

A temporal interpretation of the Maryland Security Guards Act § 19-501 would eliminate the distinction between employees' acts within the scope of employment and those outside the scope of employment. Rather than turning on the character of employee acts, the focus would be on when the acts happened and whether the security guard was on duty. Security guard agencies would be liable for a broader set of acts of their employees, including, according to Appellants, even acts in direct opposition to the employers' interests. Such a change in employer liability would alter fundamentally the common law.

Contrary to Appellants' arguments, interpreting the Maryland Security Guards Act § 19-501 to impose vicarious liability on security guard agencies for all on-duty acts of their employees would operate more than to supplement the common law. Statutes we have held to supplement, rather than abrogate, the common law provide typically alternative remedies or criminal sanctions. *See, e.g.*, *Nickens v. Mount Vernon Realty Grp., LLC*, 429 Md. 53, 74-75, 54 A.3d 742, 755-56 (2012) (holding that a Baltimore City ordinance providing for a statutory eviction scheme supplemented, rather than abrogated, the common law remedy of peaceable self-help); *Genies v. State*, 426 Md. 148, 159, 43 A.3d 1007, 1013 (2012) (holding that a statute creating a separate criminal offense for inmates exposing their private parts to correctional officers of the opposite

sex as a means to abuse corrections officers did not abrogate the pre-existing common law crime of indecent exposure). Appellants' interpretation of the Maryland Security Guards Act § 19-501, in contrast, would not create a new cause of action, but rather would modify the liability of security guard agencies for existing torts committed by their employees.[8]

The common law doctrine of respondeat superior answers the question: When is an employer liable for the torts of its employee? The Maryland Security Guards Act § 19-501 answers the same question with specific reference to employers who are security guard agencies. To change the answer amounts to an abrogation of the common law. Therefore, we look for an abundantly clear intent on the part of the Legislature to change the common law by its adoption of § 19-501.

### B. Plain Language of the Statute

The Maryland Security Guards Act § 19-501 holds clearly and unambiguously licensed security guard agencies liable civilly for some acts of their employees. The

---

[8]     Appellants argue that there could be some situations in which the off-duty acts of an employee could be within the scope of employment and, therefore, their interpretation of Maryland Code (2000, 2010 Repl. Vol.), Business Occupations & Professions Article, § 19-501 would not eliminate the common law totally. We have stated "that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law." *Robinson v. State*, 353 Md. 683, 693, 728 A.2d 698, 702 (1999) (quoting *Lutz v. State*, 167 Md. 12, 15, 172 A. 354, 356 (1934)).

     Appellants' reasoning is misguided. Their interpretation would change the core of Maryland's common law principles of vicarious liability of employers of security guards. Even if there were some remaining vestiges of the common law scheme of vicarious liability, this would not diminish the significant changes advanced by Appellants that would amount to abrogation.

parties disagree which acts of employees come within the statute. At issue is whether the Legislature intended the phrase "while the employee is conducting the business of the agency" to modify the common law principles of an employer's vicarious liability.

Appellants' major premise revolves around the temporal meaning of "while." When used grammatically as a conjunction, as it is in the Maryland Security Guards Act § 19-501, "while" means typically "during," "throughout the time that," or "as long as." *Webster's New Universal Unabridged* 2084 (1983).[9] According to Appellants then, a licensed security guard agency is liable for all acts of its employees performed during the time that the employee is also "conducting the business of the agency."

The Maryland Security Guards Act defines "conducting the business of the agency." A licensed security guard agency is defined as "a person who is licensed by the Secretary to conduct a business that provides security guard services." Maryland Security Guards Act § 19-101(g). Security guard services are defined as "any activity that is performed for compensation as a security guard to protect any individual or property. . . ." Maryland Security Guards Act § 19-101(l).

---

[9] Although the temporal meaning of "while" is uncontroversial generally, "resort to a dictionary, legal or otherwise, should logically include consultation of those editions (in addition to current editions) of dictionaries that were extant at the time of the pertinent legislative enactments." *Harvey v. Marshall*, 389 Md. 243, 260 n.11, 884 A.2d 1171, 1181 n.11 (2005). Looking at the most relevant present meaning of "while"—a Google.com search of "while definition"—indicates that the word's meaning has not changed in the years since. See *While*, Google.com, https://www.google.com/?gws_rd= ssl#q=while.

Combining these terms, Appellants arrive at the following meaning of the Maryland Security Guards Act § 19-501: A licensed security guard agency is liable for the actions of its employees occurring during the time that the employee is performing any activity for compensation to protect an individual or property.[10] Expressed another way, a security guard agency is liable for all acts its employees commit when they are "on-duty."

SSA argues, in response, that if the General Assembly intended a temporal construction, extending liability to all acts of on-duty employees, it would have done so explicitly.[11] Instead, the Legislature used language that SSA argues is a qualification based on the nature of the conduct.

The language of the Maryland Security Guards Act § 19-501 is subject to differing reasonable interpretations. Although Appellants' argument may sound logical, when taken as a whole, the phase "while the employee is conducting the business of the agency" could be understood as well as having the same meaning as the common law doctrine of respondeat superior. The common law doctrine imposes liability only for acts

---

[10] Appellants, in their reply brief to us, add the additional requirement (before a licensed security guard agency may be held liable) that there be a nexus between the tortious act and the provision of security guard services.

[11] SSA presented two arguments that are inapposite to the question before us: (1) that it is impossible to do a thing and its opposite at the same time (in this case, protect and destroy property) and (2) that Speed was off-duty at the time he and his co-conspirators committed the arson. The somewhat metaphysical question of whether it is possible to do a thing and its opposite at the same time is not part of the question certified to us. We shall not reformulate the question to put it in play.

11

by an employee furthering the employer's business, *Hopkins Chem. Co. v. Read Drug & Chem. Co.*, 124 Md. 210, 214, 92 A. 478, 479-480 (1914) (stating that employers are liable if an employee's acts were "within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by servant in furtherance thereof"), but we have summarized the rule as imposing liability for tortious acts "while the . . . [employee] was acting within the scope of the employment relationship." *Embrey*, 293 Md. at 134, 442 A.2d at 969. Neither side's urging of the meaning of the statute renders any of the text meaningless.[12] Therefore, we move on to examine other indicia of legislative intent.

### C. Context of the Statute

The crux of the Maryland Security Guards Act is the licensing scheme of security guard agencies, not the imposition of civil liability. The majority of the Act governs how an agency applies for and obtains the required licensure from the State to conduct a security guard agency. The "Miscellaneous Provisions" of the Act, of which § 19-501 is a part, however, contain sections addressed to the civil liability of security guard agencies. *See* the Maryland Security Guards Act §§ 19-504 (requiring a minimum amount of general liability insurance for agencies with more than five employees); 19-505(a)-(b) (requiring consent to venue); 19-505(f) (allowing for service of legal process under certain circumstances on Maryland Secretary of State). The internal structure of the

---

[12] Codification of the common law is not a meaningless legislative activity. Much of the Maryland Code is devoted to codification of significant areas of the common law.

Maryland Security Guards Act contributes nothing to illumination of the intentions of the General Assembly.

The broader context of the Maryland Code provides some support for the Appellants' interpretation of the Maryland Security Guards Act § 19-501. In other statutory schemes within the Code, the General Assembly uses the common law term "scope of employment." *See, e.g.*, Md. Code (1999, 2007 Repl. Vol.), Agriculture Art., § 4-127 ("when construing or enforcing any provision of this subtitle, every act, omission, or failure of any person acting within the scope of employment or office and acting for or employed by another person is the act, omission, or failure of that person as well as of the person committing the act"); Md. Code (1999, 2007 Repl. Vol.), Business Occupations & Professions Art., § 12-501(b)(2) (using the term "scope of employment" regarding insurance requirements for licensed plumbers); Md. Code (1992, 2010 Repl. Vol.), Business Regulation Art., §9A-402(b)(2) (using the term "scope of employment" regarding insurance requirements for licensed heating, ventilation, and air-conditioning workers); Md. Code (1974, 2013 Repl. Vol.), Courts & Judicial Proceedings Art., § 5-303(b) ("a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government"); Md. Code (2002, 2012 Repl. Vol.), Criminal Law Art., § 10-108 (creating an exception to the criminal statute for possession of "a tobacco product or cigarette rolling paper by a minor who is acting as the agent of the minor's employer within the scope of employment"); Md. Code (1978, 2014 Repl. Vol.), Education Art., § 6-111(a) (providing for full pay for employees absent due to

13

disability resulting from an assault "while in the scope of board employment"); Md. Code (2007), Human Services Art., §3-406 (prohibiting the State from paying judgments awarded against an employee under the section for acts or omissions occurring "outside the scope of employment"); Md. Code (1988, 2010 Repl. Vol.), Tax-General Art., §1-101 (defining "Comptroller" to include "an employee of the Comptroller acting within the scope of employment"). It seems from this that the General Assembly is well acquainted with the common law term "scope of employment," and is not averse to sprinkling it across the broad legislative landscape.

Considering the language of the Maryland Security Guards Act §§ 19-501 in the foregoing context of the Maryland Code adds some weight to the Appellants' interpretation. One might anticipate that the General Assembly would use the term "scope of employment" here if it intended to codify common law respondeat superior. In isolation, however, the absence of this term in § 19-501 does not provide sufficiently clear evidence of the General Assembly's intent to abrogate the common law.

*D. Legislative History*

The language of the Maryland Security Guards Act §19-501 has its genesis in Senate Bill 968 of the 1986 session, which codified a regulatory scheme as Md. Code (1999, 2007 Repl. Vol.), Business Occupations & Professions Art., § 13-601 (hereinafter the Maryland Private Detectives Act § 13-601). Security guard agencies remained regulated as private detectives under the Business Occupations & Professions Article of the Maryland Code until 1996 when House Bill 42 separated the Code's treatment of security guard agencies into its own title. 1996 Maryland Laws Ch. 602 (which

14

established the current regulatory scheme). The same language regarding liability was used in House Bill 42 as existed in the prior Article. *Id.* Thus, the legislative history of § 13-601 of the Business Occupations & Professions Article of the Maryland Code, which covered civil liability for private detective agencies and security guard agencies before the reorganization, is informative regarding the analogous § 19-501 of the Maryland Security Guards Act.

Senate Bill 968 of 1986 was introduced as a bill separate from a recodification initiative of the Maryland Code then underway. The separate bill was necessary because the General Assembly wished to address perceived substantive problems regarding the laws pertaining to private detectives. Department of Legislative Reference, *Report on Senate Bill 968* at 1 (1986) (hereinafter "*Report on Senate Bill 968*"). Several issues with the pre-existing statutory language regarding the licensing and provision of private detective services were identified in the Report on Senate Bill 968. The Report did not identify any problem with the regime of vicarious liability of private detective agencies or security guard agencies then in force. Notably, it stated: "[F]or the most part, the proposals under the bill find their basis in actual law and practice and do not deviate substantially from the current law as it is now is applied. There is no attempt under the revision to change existing underlying policy." *Report on Senate Bill 968* at 2.

The Report highlighted elements of Senate Bill 968 warranting special attention by the General Assembly, but in doing so did not mention § 591 of the Bill, the language of which would be codified later as Maryland Private Detectives Act § 13-601 and even

later replicated in the Maryland Security Guards Act § 19-501. Of the part of Senate Bill 968 which contained the relevant language, the Report noted:

> Part VI of the revised subtitle consists of 8 "miscellaneous" sections that do not fit well into any of the other 7 parts of the revised subtitle. While revision of these sections involve an extensive reorganization and restatement of the current subtitle, all of the revised sections are based on current law.

*Report on Senate Bill 968* at 8. In the opinion of the authors of the Report, the Bill did not modify the law regarding the vicarious liability of security guard agencies for acts of their employees.

The Bill Analysis of the Senate Economic and Environmental Affairs Committee interpreted similarly the "while the employee is conducting the business of the agency" language of Senate Bill 968. The Bill Analysis noted that "[t]he substantive changes are included for the limited purpose of clarifying existing law." Department of Legislative Reference, *Bill Analysis*, Senate Economic and Environmental Affairs Committee at 1 (1986) (hereinafter *Bill Analysis*). Each section of the Bill was discussed in the Bill Analysis. For § 591, it observed that the Bill "[s]pecifies that the agency is responsible for the acts of its employees by clarifying provisions of Article 56, Section 81(a)(1)." *Bill Analysis* at 7.

The Summary of Committee Report on Senate Bill 968 did not note anything of consequence regarding the vicarious liability of security guard agencies or private detective agencies. The Summary reiterated that "[t]he purpose of the bill is to clarify the current law without changing existing underlying policy." Department of Legislative Affairs, *Summary of Committee Report*, Senate Economic and Environmental Affairs

16

Committee at 2 (1986) (hereinafter *Summary of Committee Report*). The Summary further noted that Senate Bill 968 "clarifies current law and sets forth explicit processes that are not included under current law." *Summary of Committee Report* at 1. The legislative history of the Bill indicates overwhelmingly to us, at every turn, that the intent of the Legislature was to reiterate the law regarding security guard agencies' vicarious liability as it existed at that time.

Appellants argue that the law prior to Senate Bill 968 imposed strict liability on security guard agencies. They point also to the rejection of a proposed amendment to reword the relevant section of the Bill to incorporate the common law term "scope of employment" as evidence of the General Assembly's rejection of SSA's interpretation of the statute.

Prior to adoption of Senate Bill 968 of 1986, Md. Code (1957, 1979 Repl. Vol., 1983 Cum. Supp.), Article 56, § 81(a), enacted originally in 1951, governed the vicarious liability of security guard agencies for the acts of their employees. Section 81(a) provided:

> The holder of any license issued under the provisions of this subtitle may employ to assist him in his work and in the conduct of his business as many person as he may deem necessary, and he shall at all times during which such employment be accountable for the good conduct in the business of each and every person so employed. . . . The employer shall be responsible for the actions and conduct of all employees in connection with such employer's business.

*Id.* According to the legislative history, the General Assembly intended to incorporate the meaning of this statute into Senate Bill 968 of 1986, which later segued into the

17

Maryland Security Guards Act § 19-501. There is little evidence, however, from which we could uncover the intent of the Legislature regarding the 1951 Act.[13]

The text of the 1951 statute does not establish, on its face, the General Assembly's clear intention to abrogate the common law. The exact meaning of that statute is as ambiguous, in its fashion, as is the present §19-501. The text holding the employer responsible "for the good conduct in the business of each and every person so employed" and "for the actions and conduct of all employees in connection with such employer's business" is consistent equally with the common law's principles of vicarious liability and negligence standards as it is with any other interpretation.

Appellants make a more nuanced additional argument for reading the predecessor and current statutes as abrogating the common law. They point out that the 1951 Act was enacted two years after *Apex Smelting Co. v. Burns*, 175 F.2d 978 (7th Cir. 1949). In *Apex Smelting*, the federal Court of Appeals for the Seventh Circuit upheld a directed verdict in favor of a security guard agency, finding that under Illinois' negligence and respondeat superior jurisprudence the agency was not liable for an employee's act of arson. *Id.* at 981. Appellants claim that the Maryland General Assembly reacted to the Seventh Circuit case by enacting the 1951 Act, intending that a case similar to *Apex Smelting* would come to a different result in Maryland as a consequence.

_____

[13] The Maryland Department of Legislative Services did not begin retaining bill files and related material from the General Assembly's legislative process until 1965, and even this initiative was not established with regularity until the 1970's.

After *Apex Smelting*, the Illinois Legislature formulated a statute similar to Maryland's 1951 Act. The Illinois statute read:

> The holder of a certificate of authority who employs persons to assist him in the work of private detective and in the conduct of such business shall at all times during such employment be legally responsible for the good conduct in the business of each and every person so employed.

*Stewart Warner Corp. v. Burns Int'l Sec. Servs., Inc.*, 353 F. Supp. 1387, 1389 (N.D. Ill. 1973). Applying the statute in *Stewart Warner Corp. v. Burns Int'l Sec. Servs., Inc.* (involving a Chicago arson committed by an on-duty security guard), the U.S. District Court for the Northern District of Illinois held that the statute broadened the scope of vicarious liability of security guard agencies to include all wrongful acts of employees "so long as they were committed while the employee was actually on the job." *Id.*[14] Thus, the plaintiff prevailed.

Appellants' argument continues by pointing out that subsequently the "good conduct" language (similar to both Maryland's 1951 Act and the Illinois statute) became

---

[14] The reasoning of *Stewart Warner* may be less apt in interpreting Maryland law than it was in interpreting Illinois law. One thread in the reasoning of the Northern District of Illinois District Court was that interpreting the Illinois statute as codifying the common law would render the statute a nullity. *Stewart Warner Corp. v. Burns Int'l Sec. Servs., Inc.*, 353 F. Supp. 1387, 1390 (N.D. Ill. 1973). In Maryland, however, mere codification of the common law is not disfavored and is not considered a nullity. The District Court noted as well that the "apparent purpose" of the Illinois statute was to shift "the burden of loss from intentional injury inflicted by . . . [security] agency employees" from the consumers of the services to the agencies. *Id.* The policy reasons to adopt the interpretation might be the same in Maryland, but for the fact that the Maryland General Assembly did not make any such purpose obvious then or decades later.

controversial nationally. Some courts interpreted broadly similar statutes as the *Steward Warner* court did. *See, e.g.*, *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 596-97 (7th Cir. 1985). Other courts, construed the "good conduct in the business" language to merely codify merely the common law. *Knouse Foods Co-op., Inc. v. Burns Int'l Sec. Servs.*, Inc., 519 F. Supp. 867, 869 (E.D. Pa. 1981); *Hoover Ball & Bearing Co. v. Pinkerton's, Inc.*, 500 F. Supp. 673, 675 (W.D. Mich. 1980).[15] Appellants contend that the Maryland General Assembly changed the language in Senate Bill 968 to clarify that the 1951 Act intended to broaden security guard agencies' liability for all acts by guard employees while on-duty. That was, according to Appellants, the impetus for changing the language from holding security guard agencies responsible "for the good conduct in the business of each and every person so employed" to instead holding them responsible "for the acts of each of its employees while the employee is conducting the business of the agency."

Although Appellants advance an alluring causation narrative spanning decades and weaving through multiple related statutes and acts of the General Assembly, under close scrutiny it amounts ultimately to nothing more than plausible conjecture. It is equally likely that a general desire for implementation of a licensing regime for private detective and security guard agencies provided the motivation for the 1951 Act, with the

---

[15] *Borg-Warner Protective Servs. Corp. v. Superior Court*, 89 Cal. Rptr. 2d 687 (4th Ct. App. 1999) also held that the "good conduct in business" language of a California statute codified the common law. Senate Bill 968 was enacted in 1986, however, whereas *Borg-Warner* was decided in 1999.

Legislature unaware of or unconcerned with the Seventh Circuit's decision in *Apex Smelting*.[16] Similarly, although the General Assembly sought to make substantive changes with Senate Bill 968 that were deemed inappropriate for the contemporaneous Code recodification initiative, the substantive problems identified by the General Assembly necessitating Senate Bill 968 involved the licensing regime itself, not the state of vicarious liability of private detective and security guard employers. There is no evidence we could find that the court cases interpreting statutes from other jurisdictions with similar language to Maryland 1951 Act figured in the formulation of the language adopted ultimately in Maryland. We interpret legislation to abrogate the common law only when the Legislature's intent to do so is clear. *Suter*, 402 Md. at 232, 935 A.2d at 743-74. It is not clear that the General Assembly sought to do so in the 1951 Act.

Appellants point also to a failed amendment to Senate Bill 968 that proposed to clarify that private detective and security guard agencies would be liable only for the acts of employees within the scope of employment. The Maryland Association of Contract Guard Services, a trade group, proposed to the Senate Committee on Economic and Environmental Affairs to change the language of § 591 of Senate Bill 968 to read: "A private detective agency is responsible for the acts of each of its employees if the acts are within the scope of the employment." Loughlin Security Agency, Inc., *Proposed Changes to Senate Bill 968 'Maryland Private Detectives Act'*, Senate Committee on

---

[16] The 1951 Act was codified in Title 56 of the Annotated Code of Maryland, which was titled "Licenses."

Economic and Environmental Affairs (1986) (hereinafter *Proposed Changes to Senate Bill 968*). Senator Francis Kelly sponsored the amendment before the Committee. Francis Kelly & Maryland Association of Contract Guard Services, *Amendment to Senate Bill No. 968* (1968).

The trade group's written testimony explaining the proposed change justified it as desirable because the extant phrase imposing liability—"while the employee is conducting the business of the agency"—was ambiguous. *Proposed Changes to Senate Bill 968.* The proposed change, it was contended, would make clear that security guard agencies were subject to common law vicarious liability for acts of employees. *Id.* The Committee declined to recommend favorably to the floor the proposed amendment for the second reading of the Bill. The Bill file maintained by the Department of Legislative Services is silent about any further attempts to amend § 591 of Senate Bill 968.

Consideration of failed amendment proposals can be useful sometimes in ascertaining or confirming legislative intent. *State v. Bell*, 351 Md. 709, 721, 720 A.2d 311, 317 (1998); *NCR Corp. v. Comptroller of the Treasury, Income Tax Div.*, 313 Md. 118, 125, 544 A.2d 764, 767 (1988); *see also Ishola v. State*, 404 Md. 155, 166, 945 A.2d 1273, 1279 (2008) (using the rejection of a proposed amendment as evidence of legislative intent). Failed efforts to amend a proposed bill, however, are not conclusive proof usually of legislative will. *City of Baltimore Dev. Corp. v. Carmel Realty Associates*, 395 Md. 299, 329, 910 A.2d 406, 424 (2006); *Auto. Trade Ass'n of Maryland, Inc. v. Ins. Com'r*, 292 Md. 15, 24, 437 A.2d 199, 203 (1981). This is because there can

be a myriad of reasons that could explain the Legislature's decision not to incorporate a proposed amendment. *City of Baltimore Dev. Corp.*, 395 Md. at 329, 910 A.2d at 424.

Absent a clear indication in the legislative record, it is as likely that the effort to amend Senate Bill 968 in committee failed because, in the Committee's view, the Bill reflected already common law vicarious liability as it is that the Committee intended to abrogate the common law by reporting an unamended version of the Bill to the floor. Overall, the legislative history of Senate Bill 968 does not illuminate any clear understanding of the Maryland Security Guards Act § 19-501 as abrogating the common law.

### E. Policy Considerations

Consideration of the practical consequences of divergent interpretations of an ambiguous statute may provide insight into its meaning. When "confronted with ambiguity regarding legislative intent, it is our duty to announce a rule that we are convinced is best supported by sound jurisprudential policy germane to the pursuit of legislative intent." *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 493, 914 A.2d 735, 749 (2007). In some cases, policy considerations may outweigh other principles of statutory construction. *Id.*

Appellants urge that their interpretation of the Maryland Security Guards Act § 19-501—that it imposes liability vicariously on security guard agencies for all acts of their employees committed while the employee is on-duty—represents the best policy, and the one that the Legislature aimed to enact. As this theory proceeds, security guard agencies are in a better position to screen their employees and manage them to ensure

23

that they do not cause harm to others. The inherent ability of security guards to inflict harm on others, in part because of the trust placed in them as a result of Maryland's licensing scheme, justifies the additional responsibility placed on security guard agencies. Moreover, security guard agencies, as opposed to injured persons, are in a better position to plan for and absorb any harm caused by their employees. Appellants idealize their reading of the statute as leading to a more fair allocation of burdens, assigning responsibility to the party with greater information, and, implicitly, resulting in better management of security guards.

Appellant's policy arguments are appealing, but, as SSA offers, there are countervailing considerations. Most convincing of them is the wide range of potential acts for which security agencies could become liable were Appellants' interpretation to be endorsed. Security guard agencies would be liable for an employee's acts unrelated completely to their employment or the special trust placed in them. A security guard agency could become liable, for example, for an employee threatening his or her spouse over the telephone or publishing defamatory statements on Facebook. Such acts would be difficult to prevent by the employer and have no bearing on the agency's business.

As noted earlier, Appellants, in their reply brief, propose a limitation on their interpretation of the statute that would prevent the kind of absurd results of which SSA warns. They would add the requirement of a nexus between an employee's on-duty wrongdoing and his or her provision of security services (such that the alleged tort is incident to the employee conducting the agency's business) before liability could arise under the Maryland Security Guards Act § 19-501. Appellants provide, beyond mere

24

benevolence, no principled support for this additional requirement in the text of the statute or any indicia of legislative intent.

Although the requirement of such a nexus might dissipate the problematic hypotheticals suggested by SSA, that it was even proposed stands in opposition to the policy considerations underlying our rule of construction by which we interpret statutes in accordance with the common law, absent clear intent of abrogation. Ultimately, these policy considerations overcome whatever benefits might arise from the interpretation of the Maryland Security Guards Act § 19-501 as proposed by Appellants.

Even seemingly small changes to the law, though motivated by conciliation and good intentions, often require future clarification, as Appellants' offered interpretation of the Maryland Security Guards Act § 19-501 demonstrates. Courts would have to determine eventually what "nexus" between employees' on-duty wrongdoing and providing security services is sufficient to impose vicarious liability on employers. Because neither the statute nor its legislative history provides guidance on that score, courts would be developing the nexus analysis from whole cloth, resulting in uncertainty in the public and business arenas until fleshed out. The one nexus that is well understood by lawyers and judges—within the scope of employment—would be entombed were we to accept Appellants' offer in this regard.

The common law doctrine of respondeat superior has its genesis in 17th and 18th Century England. Christine W. Young, Comment, *Respondeat Superior: A Clarification and Broadening of the Current "Scope of Employment" Test*, 30 Santa Clara L. Rev. 599, 601 (1990). The doctrine was adopted by courts in the United States and, over time,

25

broadened to incorporate more acts of the employee. *See generally id.* (describing the adoption of respondeat superior by American courts and outlining its expansion in California). The common law has the advantage of the collective wisdom of a multitude of courts refining the doctrine over centuries. We are not convinced that the policy considerations that Appellants offer in support of their interpretation of the Maryland Security Guards Act § 19-501 are more desirable than (or an improvement over) those underlying the common law.

## III. CONCLUSION.

Considering the ambiguity of the Maryland Security Guards Act § 19-501, its context in the Maryland Code, its legislative history, and the policy considerations of alternative interpretations, we conclude that the Legislature has not indicated to our satisfaction a clear intent to abrogate the common law. We hold therefore that the Maryland Security Guards Act § 19-501 has the same meaning as Maryland's common law doctrine of respondeat superior. Thus, we answer the certified question in the negative.

**CERTIFIED QUESTION ANSWERED AS SET FORTH ABOVE. PURSUANT TO SECTION 12-610 OF THE COURTS AND JUDICIAL PROCEEDINGS ARTICLE, THE COSTS SHALL BE DIVIDED EQUALLY BETWEEN THE PARTIES.**